and I'd like to reserve about two minutes for rebuttal. This is an asylum case in which the primary issue is an adverse credibility. There was an alternative finding of assuming credibility, no past persecution or well-founded fear. It's subjective evidence, and it is certainly with regard to the adverse credibility, but I would say that the record compels a reversal. The Court in finding a lack of credibility in this rather lengthy decision looked at a number of different types of discrepancies, and I would say that one of the themes here is that they're not discrepancies or may even be misstatements of the record. One of the discrepancies with regard to the events having to do with the December 22, 1998 event focused on the distinction in the wife's and the husband's testimony as to whether or not the husband, Norik, was harmed during the – when the police came in and arrested him and two other people. What Ms. Finosian said is that her husband was not harmed. He said, and Norik did not say that he wasn't harmed. He – what he did say is that he was pushed or he was attacked, and that whatever harm he suffered came in the detention, which is what also the wife said as well. So he didn't say that he wasn't harmed. He said he was pushed. He didn't use those terms. And so I would say that that's not really a discrepancy at all. The – some of the other – otherwise, the – their characterizations of the events are pretty much the same. The judge also points to discrepancy between the declaration and Norik's testimony about that event, and the declaration says that he was severely beaten. And then in here he – and then in the testimony, he talks about that he was harmed while he was in custody. I don't – again, he may have fleshed out the details, but under the case law of this circuit, one is allowed to flesh out details, but there's no discrepancy between severely beaten and what happened to him. Some of the other discrepancies having to do with the events are either insignificant or basically insignificant. The heart – but the heart of this had to do with the whole whether or not they knew anything about the religion. Well, before we get to that, but the heart of the claim surely is their claim that they were persecuted in fear of future persecution based on their faith, their Jehovah's Witness faith, correct? Yes, and their actions as Jehovah's Witnesses. Your client stated in his asylum interview that he was baptized at the age of 18. Well, is that correct or incorrect? First of all – and I know this is going to sound like I'm not responding to your question, but that was not verified at hearings. Let's try it this way. The immigration judge pointed to a discrepancy between the date of baptism reflected in the I.J.'s view of the asylum interview – listen to the question – and what was said on direct examination. According to the I.J., he said in his asylum interview he was baptized at the age of 18. On the stand under oath, he said six or seven years old. Correct. Yes, and the asylum officer's assessment stated that Norek said at the interview that he was baptized at the age of 18, and in testimony, Norek said around six or seven. That is correct. However, the problem here is that, first of all, the judge himself – I mean, it's this whole use of the asylum officer's memo. The judge himself is saying that he gives practically no weight to the asylum officer's statement. He also said that the conduct of asylum officer interviews don't comply with basic due process rights, so he gives it very little weight. So he said that during the hearings. And then the – and then the – despite what the judge said in the – in the oral decision, the Petitioner's counsel vigorously – vigorously objected to the asylum officer's notes being admitted, and especially when he didn't even get a chance to cross-examine the officer. And the judge would say – kind of go back and forth, saying, well, I'm not really using, in the oral decision, the asylum officer's notes to say something about credibility. It's just that it's here to show that, well, he had been in asylum interview, and then he was referred to the court as background, but really – Was he asked about the difference between the two? No. No. He was not specifically – and that's also one of the questions. No cross-examination when he testified in direct at the IJ hearing. You have to listen to the question. No, I'm not. Don't anticipate the question. Listen to the question. Yes. No, I – Okay? I hear you. I'm sorry. All right. He was not asked on cross-examination at the IJ hearing about the alleged discrepancy, if you will, between the asylum interview and his direct testimony on the day of his baptism. That's correct. There began to be – during cross-examination, there began to be a question that was brought up by government counsel, sir, at the interview, something mentioning about when you were baptized at 18, and then the whole controversy surrounding that, the asylum officer note, the objections and all that ensued after that. So there was – after that, they didn't really go back to that specific question. Was there a discrepancy? Why is there – why did you say – allegedly say one thing and another? Well, there was a discrepancy. There's no doubt about it. Right. There is a difference between the asylum officer's notes and the testimony. Why do you think it's not important? It's not – it should deserve little weight, and it's not important because, first of all, the asylum officer's notes, as the judge himself said – But let's assume that they're valid. I mean, the fact is the IJ relied upon that. So here we are, and we can say, well, we shouldn't give it much weight at all. But let's assume for the sake of the argument that there is a discrepancy between what he told the asylum officer and what he testified about. Why wouldn't that be important? It would not be important because it doesn't put into question whether or not he was baptized. It just puts into question when he was baptized. He didn't say, I wasn't baptized, and then in another situation said that he was. That's to do with the distinction in time. And this particular – Is your client's position – I mean, it's not in the records, so I don't think we which is not uncommon in some cases. No, it would not. My understanding in looking at the record – Just one. Just one. Because there was a question put to him, well, sir, were you baptized in Iran? And he said he was. And then there was a question about, well, when the family moved to Armenia, did you get another baptism in the church there? And he said, well, I just had one baptism. And I don't think that there was a theological discussion that ensued after that, but I think I get from that it was just one. I just want to say that the record is – one of the things the judge did not point out in the record is how much actually taken together Emma and Norik actually knew a lot about the religion. There was a whole – during cross-examination and direct of Emma, they asked all these questions about how many people are in heaven under Jehovah Witness, the stuff about the blood transfusion, what happens to the soul after death. And she answered all of them correctly, even if looking at – you know, this felt like a proctored exam or something by people who didn't know much about the religion other than what they had submitted. And if you compare that to what is in the materials, they were correct. One of the other things that people focused on was this whole thing about the trinity. Now, Emma did not say that she – that they believed in the trinity. They do – and the documents themselves show that they do believe in Jehovah, the Holy Ghost, and the – and Jesus as separate entities but not as one. And I can see I have seven seconds left. There's – I really – I could spend all day talking. Why don't we give you a minute for rebuttal? Okay. Thank you for your argument. We'll hear from the government at this time. Thank you, Attorney General. Mr. Robbins. Good morning, Your Honors, and may it please the Court. My name is Jonathan Robbins, and I'm here on behalf of the Attorney General and the respondent in this matter. Your Honors, the record doesn't compel a conclusion that the petitioner in this case was credible or the petitioners in this case were credible. Generally what happens, and I probably don't have to tell you this, is that when somebody is giving a story that isn't credible, usually all you have to do is pull on the threads and the story begins to unravel. And this story unravels pretty early on in proceedings. If you look at the declaration that was submitted with the asylum application, what they originally claimed was that there was this incident on December 22nd of 1998 and that after this incident they saw some random men following them around, and that was when they resolved to flee Armenia. And then we find out that during proceedings that their visa was issued on December 10th, 12 days before this incident that was the impetus, the supposed impetus, for coming to the United States. And so then what happens? Well, then they go before the asylum officer and we have new incidents that are added. We have an incident in 1995 and two incidents in 1997. And then we get to the direct testimony and those two incidents in 1997 become an incident in April 1998. So right off the bat you can begin to see the story that they're getting unraveled. And now the record doesn't compel a conclusion. In other words, what we're looking for is the only way the immigration judge could have come out in finding that they were credible. And given the major inconsistencies in this case, I don't think you can reasonably do that. I mean, as Your Honor has mentioned, there's this baptism. How do you confuse being baptized at 6 or 7 years old with 18 years old? I mean, if you couldn't remember if you were 6 years old or 8 years old, I mean, that might be something that's understandable. But we know from the record evidence that to Jehovah's Witnesses the date of your baptism is more important than your actual birthday. So how do you confuse 6 or 7 years old and 18 years old? How do you confuse that? We go back to the asylum officer's interview. He says he does not recall telling the asylum officer he was baptized at age 18. Well, he was asked during direct testimony, they said, he was asked about the discrepancy. They said, do you recall what you told the asylum officer when he asked you how old you were when you were baptized? And his response is, whatever I said today. And that was his response. I mean, they directly asked him. They didn't say, do you remember saying that you were 18 years old? Actually, I think they did. And I think he said no in response to the question. At the same time, the immigration judge made the kind of comments that were alluded to earlier with regard to he doesn't put much weight. There is on record 291 questions. Sir, do you recall telling the asylum officer that you were 18 when you were baptized? Answer, no. So he says he didn't say that or doesn't recall saying that. Well, he doesn't recall saying it, but he did say it. No, we don't know that. Those are the notes. They were not subject to cross-examination. Well, the petitioner in this case had the power to subpoena the asylum officer if they had wanted to challenge what was in the asylum notes. And remember, when the immigration judge gives limited probative value to evidence such as the asylum notes, that doesn't mean that they're completely without value. Now, if the petitioner says to the asylum officer, I was baptized when I was 18, and the asylum officer writes that down in his notes, I think what the immigration judge was really getting at is, okay, I'm not going to use this asylum officer's notes as saying that you're not credible in claiming that you're a Jehovah's Witness. He wasn't going to use that standing alone to justify an adverse credibility finding. Shouldn't we, as judges, have a little discomfort with immigration judges? I assume this immigration judge was not an adherent of the Jehovah's Witness faith. I do not believe he was. And I assume the government lawyer wasn't. To my knowledge, no. And there was no expert witness called by either side about the tenets of the practice of that particular faith, either here or in Armenia or in other places? There were no expert witnesses. It was limited to simple reports about what Jehovah's Witnesses believe and things of that nature. I think he got it, I.J. got it, from USA Today or something like that? Well, these were both documents that were submitted by the government and by petitioners. Shouldn't we feel a little uncomfortable in that sort of situation about examining people about their faith? I mean, I could see someone from another country who converted as an adult to Christianity being asked under oath this question. What was Jesus' faith during his life? Answering in Christian and being wrong. Jesus was a Jew. Certainly, I don't think the immigration judge here was requiring that they know every single thing about being a Jehovah's Witness. I think it was more about the general inconsistencies, not just about being a Jehovah's Witness, but it was a combination of, like I said before, the inconsistencies between the incidents of alleged persecution that they were making. For example, there were inconsistencies between the husband and the wife's testimony. The husband said at the December 22, 1998 incident that they were violently attacked, that these officers were like animals. And then we have the wife who says nobody was harmed at this incident. Why is that inconsistent? I mean, basically she said they were shoved. I mean, that's just a description, isn't it? Well, even if he said, I was beaten up and my arm was broken and all this thing happened in the house, and she said, no, you were just shoved, that would be an inconsistent statement. But when I read it, I didn't see it was all that much of an inconsistency. Well, even if you put aside that inconsistency, there are other inconsistencies. They claim that they practiced Jehovah's Witness, that they practiced their religion in secret. And then the judge asked them about proselytizing. And they said, well, we went door to door on Saturdays from 8 to 12. And remember, the wife had already, both the wife and the husband had both already testified that there were no other police stops other than the 1995, 1998 and the two 1998 incidents. And then the judge said, well, was a little confused because if you're going door to door, how can you practice your religion in secret? And then the wife's story changed and said, oh, there were many, many police stops. I mean, this is what happens when you're not being credible. Your story begins to unravel. And all of a sudden you have to change your story. So all of a sudden no other police stops became many, many police stops, which, by the way, she couldn't remember any dates or any circumstances involving those new police stops that just appeared out of the blue. And that's really the problem with this case. Does the record compel a finding of credibility here, given these major inconsistencies with the baptism, with the discrepancies in these alleged dates of persecution? I know Your Honor doesn't see an inconsistency, but the government would still defend it. That's pretty minor. I mean, is it a true inconsistency or is it a misdescription? When you say standing alone, it really doesn't appear to be a major inconsistency to me. Well, I think when you view it in the context here of all these other inconsistencies. There are a lot of minor ones, at least in my, frankly, mind. There may be enough to sustain it, but there are a lot of fairly minor inconsistencies. And I do share a bit of skepticism about I.J.'s quizzing on, for example, the Trinity, which many people find difficult to explain. And I've read the explanation here, and I think, well, it's not horribly inconsistent with what witnesses believe. Well, the problem here is that a lot of the- And if we might just finish my thought. Sure. I mean, people don't, persecutors, people who persecute at the base of religion don't give a quiz when they're persecuting. They quiz because they think someone is a member of their religion. So that's the key thing. Were these people members of Jehovah's Witnesses, and were they persecuted on the basis of that membership? It's not necessarily critical what they believed or the depth they believed or sophistication in their belief. You're right. You certainly don't have to be the most sophisticated Jehovah's Witness in order to testify as to whether or not you're- in order to qualify yourself as a Jehovah's Witness. I think the problem here were basic lack of understanding about the most basic tenets of being a Jehovah's Witness. Like I said before, the baptism is the most important date. They don't even celebrate their own birthdays. The date that is important to them is the date of their baptism. They didn't- They both testified that they celebrated Easter, and I'll get to that in a second because there's even more inconsistency with that. But Jehovah's Witnesses don't celebrate Easter. They celebrate that one holiday to them on October 1st, and they view other holidays as belonging to ancient false religions. I mean, it's not so much that they don't celebrate holidays. They believe strongly against them. And the fact that they testified, you know, first- Do we know all of this because- Based on what we know from the documents about Jehovah's Witnesses. And they didn't contest this. And when you look- You know, first we start off before the asylum officer. He testifies that he remembers maybe celebrating Easter once. Then on direct testimony, we get a couple of times. And then the wife comes up and testifies and also testifies to Easter. And there's one more argument that I'd like to address very quickly. They've alleged that the interpreter caused some problems here, particularly with regard to the issue about Easter. And if you look at the way they've challenged this in their brief, they haven't cited to any specific parts of the record that they claim the interpreter messed up on. And they didn't do that in their brief before the board either. Now, attached to their notice of appeal before the board, they had- May I just finish this? You can finish the thought, yes. Thank you. Attached before the board, they had made this argument that the interpreter erred with respect to the way they celebrated Easter. And then there's this subtle change in the briefs afterward that completely drops this specific citation to error by the interpreter. And the reason they did that is because there were two separate interpreters here. So both interpreters would have had to have messed it up. And I don't think they wanted to continue forward with that argument. And really, at the end of the day- You're starting on something else. I was just finishing- Finish it up. Finish the thought. Don't start another argument. I would respectfully request that this Court uphold the decision of the Board of Immigration Appeals. Thank you for your time, Your Honors. Thank you. Minute for a vote. First of all, with regard to the whole Easter thing, in her cross-examination, Emma Pinozian mentioned that the day that they- that's an important day for them. And she was talking about the day of Jesus' death. And there was a whole discussion about that. Now, maybe the husband didn't have the world's greatest discussion on that. But she, in the record, I think, is very clear it was about Jesus' death. The other thing- Actually, another thing is- and I don't know if the Court's interested in the whole alternative argument. I just wanted to make one point on that. As far as the translator, I'm just saying I don't think that's really an issue. So, I'm sorry. I'm going to pause the video for down to nine seconds. Okay. The judge in his alternative discussion assumed- is saying for the sake of argument, assuming well- they were- had past persecution and had well-founded fear. And then he comes up with something called severe past persecution. And that is incorrect. It's not even in the Act that mentions that. And he's taking a Chen type of approach, but that's not the claim. And I see that. Okay. Thank you. Thank you both for your arguments. The case just heard will be submitted for decision.
judges: Hawkins, Thomas, Clifton